UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

PERRY REICH

                                 **MEMORANDUM & ORDER**

                                      **07-CV-2406 (NGG)**

                         Petitioner,

               -against-

UNITED STATES OF AMERICA

                         Respondent.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

       Petitioner Perry Reich ("Petitioner" or "Reich") seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2255. (See Petition to Vacate, Set Aside or Correct Sentence by a Person in Federal

Custody & Attachment A ("Petition") (Docket Entry # 1).) In 2006, a jury convicted Reich of

one count of corruptly obstructing a judicial proceeding, in violation of 18 U.S.C. § 1512(c)(2),

one count of forging a judge's signature, in violation of 18 U.S.C. § 505, and one count of

making a false statement to a federal officer, in violation of 18 U.S.C. § 1001(a)(2).

       Reich challenges his conviction on three grounds. Reich asserts, first, that he was denied

effective assistance of counsel; second, that the prosecution failed to disclose exculpatory

evidence in violation of the Constitution; and third, that this court unconstitutionally received a

private sentencing recommendation from the probation department.

       This court previously upheld Reich's conviction over his challenge under Federal Rules

of Criminal Procedure 29 and 33. See United States v. Reich, 420 F. Supp. 2d 75 (E.D.N.Y.

2006). The Second Circuit affirmed the conviction on direct appeal. United States v. Reich, 479

F.3d 179 (2d Cir. 2007) (Sotomayor, J.). Stephen Mahler, Esq. ("Mahler") represented Reich

before trial. Mahler also represented Reich at trial with co-counsel Richard Sgarlato ("Sgarlato"). Mark Baker, Esq. and Benjamin Brafman, Esq. represented Reich for all post-conviction proceedings. Albert A. Gaudelli, Esq. currently represents Reich.

## I.    BACKGROUND[1]

Reich's convictions stem from forging a judicial order in connection with a civil action (the "Ryan Beck lawsuit") in which Reich was a defendant. In that civil suit, the Law Offices of Joel Davidson ("the Davidson firm") represented the plaintiff. On June 17, 2003, at 11:08 a.m., Reich sent the Davidson firm a forged order pertaining to the Ryan Beck Lawsuit that was purportedly issued by Magistrate Judge Roanne L. Mann. Phone records introduced at trial indicate that a call was made from Reich's home to the Davidson firm fax machine at 11:08 a.m. on June 17th. The call was made with a pre-paid AT&T calling card that Reich previously purchased.

During the FBI's investigation and his trial, Reich denied creating or sending the forged order on four separate occasions. First, in a July 31, 2003 interview with FBI Agents Richard Wilfing ("Agent Wilfing") and Robert Katzman ("Agent Katzman") Reich stated that he could not recall interacting with Joel Davidson, the defense attorney in the Ryan Beck lawsuit. Reich also denied using pre-paid telephone cards. Second, during an FBI search of his home, Reich admitted to Agent Wilfing that he may have contacted Joel Davidson regarding a confidentiality agreement that Reich may have faxed. Third, at a proffer session at the United States Attorney's Office, Reich denied owning or using an AT&T calling card, but said that he purchased a prepaid calling card for his girlfriend in 2002. Reich reiterated that he was trying to reach Joel Davidson, but accidentally dialed the Davidson firm's fax machine. He explained that the call lasted over

---

[1] The court recites background facts from its previous opinion addressing Reich's post-trial motions. See United States v. Reich, 420 F. Supp. 2d 75 (E.D.N.Y. 2006).

three minutes because his phone does not always disconnect after hanging up. Finally, at trial, Reich denied creating or sending the forged order, but admitted to calling the Davidson firm's fax machine at the time that the Davidson firm received the forged order via fax. Reich also testified that he used an AT&T calling card to make the call because he was having trouble making a telephone connection through his Verizon account.

Reich alleges that, after the July 31, 2003 interview with Agents Katzman and Wilfing, he retained defense attorney Mahler to represent him in the matter. (See Petition 1.) On the day that the FBI searched Reich's home, Assistant United States Attorney Peter Katz ("AUSA Katz") told Mahler that the Government "intended to prosecute [Reich] for forgery and suggested that Mahler bring [Reich] to a 'proffer session'" on March 3, 2004. (See id.)

According to Agent Wilfing's testimony at trial, a proffer session is "an opportunity for a subject to come in, make statements, [and] tell us what they know." (Trial Transcript ("Tr.") 594.) Agent Katzman testified on cross-examination that the purpose of the proffer session "was to find out [Reich's] side, and to allow him to basically admit to us that — if it was a joke, to admit to us at the time it was a joke and that perhaps we could work on some kind of agreement." (Tr. 778.)

Reich testified at trial that he voluntarily attended the proffer session. (Tr. 895.) Agent Wilfing, Reich, Mahler, AUSA Katz, and Agent Katzman all signed a proffer agreement that outlined terms and conditions governing the proffer session. (Tr. 595.) The agreement provides that the Government would not use any of Reich's statements made at the session at sentencing or in its case-in-chief, "except [in] a prosecution for false statements, obstruction of justice, or perjury." (See Proffer Agreement ¶ 2.) The agreement further states that the Government may use any statements made by Reich "as substantive evidence to cross-examine" him, should he

testify, and "as substantive evidence to rebut . . . any evidence offered or elicited, or factual assertions made, by or on behalf of [Reich] at any stage of a criminal prosecution." (See id. at ¶ 3.)

During the proffer session Reich was confronted with the allegation that he sent the forged order during his 11:08 a.m. phone call to the Davidson firm fax machine. Agent Wilfing testified that Reich responded by stating that he had been trying to reach Joel Davidson but mistakenly dialed the fax machine number and that his telephone sometimes did not disconnect after a call is ended. (Tr. 600-01.)

On direct-examination, Reich testified that his understanding at the proffer session was that "if I said it was a joke that what would happen is they would refer it to some kind grievance committee for review but there would be no criminal prosecution, no possibility of going to jail or anything like that." (Tr. 896.) Reich did not agree to those terms. At trial, he testified that "no matter what, no matter the consequences are, consequences were to me I said I would never, never say that. I didn't do it. As [I] sit here today, I will never say that I did something I didn't do." (Id.)

## II.    DISCUSSION

Under 28 U.S.C. § 2255, a court may "vacate, set aside or correct" a conviction or sentence "imposed in violation of the Constitution or laws of the United States." "If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rules Governing Section 2255 Proceedings, Rule 4(b). Reich asserts that his conviction is in violation of the Constitution because (i) he was denied effective assistance of counsel, (ii) the prosecution failed to disclose exculpatory evidence in violation of the Constitution; and (iii) this court received a

private sentencing recommendation from the probation department. The court considers each claim in turn.

### A.    Ineffective Assistance of Counsel

Reich alleges five factual bases to support his ineffective assistance of counsel claim. The court finds that each basis is without merit. Claims for ineffective assistance of trial counsel may be considered for the first time in a § 2255 petition. See Massaro v. United States, 538 U.S. 500, 507-08 (2003). Under Strickland v. Washington, 466 U.S. 668 (1984), defendants asserting claims for constitutionally ineffective assistance of counsel must show (1) that counsel's representation "fell below an objective standard of reasonableness," id. at 688, and (2) that counsel's deficient performance prejudiced the defendant, id. at 694.

Strickland's first prong of deficient counsel performance is measured by prevailing professional norms. Id. at 688. The inquiry is "whether counsel's assistance was reasonable considering all the circumstances." Id. The court considers the attorney's performance at the time of the challenged conduct and in light of the facts of the particular case. Id. at 690. Every effort must be made to "eliminate the distorting effects of hindsight." Id. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. "[A] strategic decision is a conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." Cox v. Donnelly, 387 F.3d 193, 198 (2d Cir. 2004).

Strickland's second prong requires that a defendant alleging deficient attorney performance affirmatively prove prejudice. 466 U.S. at 693. "It is not enough for the defendant

to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A court deciding such a claim "must consider the totality of the evidence before the judge or jury." Id. at 695.

Habeas petitioners have the burden of establishing both the deficient performance prong and the prejudice prong. United States v. Birkin, 366 F.3d 95, 100 (2d Cir. 2004). But "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

### 1.    The Proffer Session

In this Petition, Reich claims that although he thought that going to the proffer session was a bad idea, he followed Mahler's advice and accompanied him to the session. (See Petition 1.) According to Reich, Mahler told him that attending the proffer session would preclude an indictment. (See id.) Reich alleges that he and Mahler went to the session without any preparation or prior discussions about a potential plea negotiation and that Mahler advised him to tell the Government his side of the story. (Id. at 2.) Reich asserts that attending the proffer session accomplished nothing other than causing the Government to add a count of making false statements to his indictment—Reich's false statement count was based on statements he made at the proffer session. He argues that "[a] competent attorney would not have had his client make any statements, absent a plea agreement," but "would have made the proffer himself" or would not have taken his client to the proffer session at all. (See id. at 3.) Reich contends that Mahler had no strategic reason to bring him to a proffer session. (See id. at 2.)

The issue for the court is whether Mahler rendered deficient performance by advising Reich to tell the Government his side of the story. The parties have not cited, and the court has not found, any Second Circuit authority on point. But other Courts of Appeals have established the following principles. Advising a defendant to convey exculpatory information to the police, which later turns out to be false, does not constitute deficient performance. See Still v. Lockhart, 915 F.2d 342, 344 (8th Cir. 1990). "Although blind acceptance of the defendant's story may be improper, counsel has a right to assume his client is telling the truth." Id. Similarly, counsel does not render deficient performance by allowing his client to speak to government agents to lay a foundation for potential plea negotiations. See United States v. Lewis, 117 F.3d 980, 984 (7th Cir. 1997). This is because "it seems reasonable for the attorney to . . . allow[] [his client] to speak to the [government] agent in order to lay the groundwork for a sentencing reduction for acceptance of responsibility or a departure for substantial assistance." Id.

In this case, Mahler's advice that Reich tell the Government his side of the story at the proffer session was "reasonable considering all the circumstances." Strickland, 466 U.S. at 668. This is not a case in which counsel advised his client to make false statements to the Government. Reich does not allege that he told Mahler his story was false or that Mahler should have independently known that he would make false statements at the proffer session. In short, Mahler had the "right to assume his client [was] telling the truth." Lockhart, 915 F.2d 344. And because Reich, an attorney, signed a proffer agreement apprising him of the consequences of making false statements, Mahler's reliance on this principle is all the more reasonable.

Reich's allegation that Mahler had no strategic reason for bringing him to the proffer session is contradicted by his own Petition. According to Reich, Mahler told him that attending the proffer session "would preclude an indictment." (See Petition 1.) In other words, Reich

admits that attending the proffer session was Mahler's strategy for precluding an indictment. Taking steps to prevent criminal indictment is a sound strategy that counsel may pursue to benefit his or her client. See Cox, 387 F.3d at 198; Lewis, 117 F.3d at 984. Mahler's advice that Reich speak with the Government lays the groundwork that the Seventh Circuit noted counsel reasonably pursues to obtain Government concessions. See Lewis, 117 F.3d at 984. At trial, Reich testified that he understood that the Government would not prosecute him if he would admit to sending the forged order. (Tr. 896.) Not only was Mahler's advice objectively reasonable, the record shows that it was prudent. Agent Katzman testified that the Government was prepared to work out some sort of agreement based on Reich's statements at the session. (See Tr. 778.)

Accordingly, Reich's claim that Mahler rendered deficient performance by bringing him to a proffer session fails Strickland's first prong and cannot support a claim for ineffective assistance of counsel.

### 2. Negotiation of a Non-Prosecution Agreement

Reich claims that Mahler was ineffective by failing to negotiate a non-prosecution agreement on his behalf. Although Reich testified at trial that he would never admit to sending the forged order, Reich now claims that he asked Mahler to see "if there was any basis for a compromise." (See Petition 3.) Reich alleges that he repeatedly asked Mahler to pursue a compromise in oral discussions and by email. (Id. at 4.) Reich states that he can corroborate this allegation with emails that he sent to Mahler. (Reply Memorandum of Law & Declaration (Docket Entry # 11) ¶ 9.) According to Reich, Mahler consistently responded by stating, "[w]hat are you talking about? They are not offering any 'compromise.' And it's taking so long, it will probably just go away." (Petition 4.)

In his Petition Reich further alleges that, at the proffer session, and outside of his presence, Mahler held a discussion with FBI agents and AUSA Katz at which the Government indicated that it was prepared to negotiate a non-prosecution agreement. (Id. at 2-4.) Reich supports this allegation with transcript citations in which co-counsel Sgarlato asked Agent Katzman on cross-examination,

> Question:  And didn't the government say, well, if you'll admit that you played this joke we will drop these charges, did you tell him that.

> Answer:  I don't recall the discussion with Mr. Reich that the charges would be dropped.  I believe that there was a discussion outside of his presence that if this was a joke there would be something that maybe we could work on but I don't believe that that was discussed in his presence.

(Tr. 777-78.) Reich also alleges that Mahler did not tell him what transpired outside of his presence. (Id.)

Reich further contends that AUSA Katz confirmed to Sgarlato that a non-prosecution agreement was on the table. (See id. at 4.) He alleges that at trial, but off the record, AUSA Katz responded affirmatively to Sgarlato's question of whether Agent Katzman's testimony about the Government's willingness to negotiate a non-prosecution agreement was true. (Id.) Sgarlato then asked "[w]hy are we here then?" (Id.) AUSA Katz pointed to Mr. Mahler and stated "why don't you ask him." (Id.) Reich provides no factual support for this exchange. Reich also asserts that "Mahler never discussed any plea offer from the government, never discussed the strength or weakness of the case against me, never discussed the possible penalties or the Sentencing Guidelines, and did not fully and constitutionally advise me of the pleas to enter." (Reply Memorandum of Law & Declaration ¶ 8.) Based on these assertions, Reich argues that Mahler failed his constitutional obligation to "assess the evidence and to recommend

the acceptance of a non-prosecution agreement, as well as to negotiate such an agreement." (See Petition 4.)

On Strickland's first prong, the Second Circuit has made clear that defense counsel "must give the client the benefit of . . . professional advice on [the] crucial decision" of whether to plead guilty. Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996). "Even if there might be circumstances where defense counsel need not render advice as to acceptance of a plea bargain, there can be no doubt that counsel must always communicate to the defendant the terms of any plea bargain offered by the prosecution." Cullen v. United States, 194 F.3d 401, 404 (2d Cir. 1999). Failing to communicate a plea-bargain offer is objectively deficient performance. See id. But adequate attorney performance does not necessarily require "that the defendant have counsel who recommends that a plea bargain be pursued." Brown v. Doe, 2 F.3d 1236, 1246 (2d Cir. 1993).

A defendant establishes Strickland's prejudice prong in the plea bargaining context by showing—by a reasonable probability—that but for counsel's deficient performance he or she would have pleaded guilty. See Cullen, 194 F.3d at 404. To make this showing, a defendant must put forth objective evidence that he or she would have accepted a plea agreement. United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998). A defendant's "self-serving, post-conviction testimony" cannot, by itself, establish a reasonable probability. Id.

Applying these principles to this case, Reich cannot establish that he was denied effective assistance of counsel because Mahler failed to successfully negotiate a plea bargain on his own initiative. Mahler had no independent constitutional duty to recommend to Reich that he should pursue plea negotiations. See Brown, 2 F.3d at 1246. Reich also cannot claim deficient attorney performance based on Mahler failing to communicate to him the terms of a plea bargain offered

10

by the Government. Reich does not allege, and the Government denies, that it offered him a plea bargain.

Reich does contend, however, that the Government would have offered him a plea bargain had Mahler pursued plea negotiations that he requested. To support his contention that the Government was prepared to negotiate a plea bargain, Reich refers to (i) Agent Katzman's trial testimony that there was a discussion about a possible non-prosecution agreement out of Reich's presence and (ii) the exchange in which AUSA Katz pointed to Mahler when defense co-counsel Sgarlato asked AUSA Katz why they were at trial. (Petition 3-4.) And at trial Reich testified that he understood the purpose of the proffer session was to negotiate that the entire matter would be referred to a grievance committee and the Government would not pursue a criminal prosecution, if he only admitted that sending the forged order was a joke. (See Tr. 896.)

The issue before the court is whether the Government's willingness to negotiate a non-prosecution agreement and Mahler's failure to successfully negotiate one constitutes ineffective assistance of counsel. Reich claims that he repeatedly asked Mahler to pursue a "compromise" with the Government after the proffer session and before his indictment. (See Petition 4.) He asserts that he can corroborate this claim with emails that he sent to Mahler from his home computer. (See Declaration ¶ 9.) Reich states that he did not include those emails with his Petition because he was incarcerated when he prepared his Petition and could not access his home computer from prison. (Id.)

The court need not consider whether Mahler actually ignored Reich's instructions to pursue a plea offer.[2] Reich's testimony at trial precludes him from establishing <u>Strickland</u>'s

---

[2] But the court notes that under the American Bar Association's Rules of Professional Conduct, "a lawyer shall abide by a client's decisions concerning the objective of representation." Model Rules of Prof'l Conduct R. 1.2(a) (2009). In a criminal case, this includes the client's decision of whether to enter a guilty plea. See id. Ignoring a

second prejudice prong. See Cullen, 194 F.3d at 404. Three facts preclude Reich from making that showing.

First, Reich consistently maintained that he was innocent throughout the FBI's investigation and his trial. He denied sending the forged order on at least four occasions: (i) during his first interview with the FBI, (ii) in a second FBI interview while his home was searched, (iii) at the proffer session, and (iv) at trial. A defendant's insistence of innocence "is a factor relevant to any conclusion as to whether he has shown a reasonable probability that he would have pled guilty." Cullen, 194 F.3d at 407. And if the government has not offered the defendant a plea bargain, a defendant's insistence of innocence may preclude finding that counsel ineffectively failed to negotiate a plea. See Gluzman v. United States, 124 F. Supp. 2d 171, 178 (S.D.N.Y. 2000) ("Where the government does not offer a plea, and where the client insists that she did not participate in the crime, a failure successfully to negotiate a plea does not amount to ineffective assistance of counsel."); Londono-Tabarez, No. 07-CV-3572 (DAB), 2008 WL 80729, at *6 (S.D.N.Y. Jan. 2, 2008) ("Given his vehement protestations of innocence prior to and at trial, coupled with the fact that the Government never made him an offer, the Court finds incredible the assertion Movant now makes that he would have pled guilty if he had been provided an offer or counseled to do so."). This court recognizes that Reich's insistence of innocence cannot, by itself, determine that he would not have pled guilty if given the opportunity. But his insistence greatly reduces the probability that he would have done so. The fact that the Government never offered a plea bargain a fortioti reduces that probability.

Second, Reich expressly rejected what he perceived to be an invitation by the Government to negotiate a non-prosecution agreement at the time of the proffer session. At trial,

criminal defendant's decision about entering into a plea-bargain or non-prosecution agreement is a direct violation of the Model Rules of Professional Conduct.

12

he testified that his understanding at the proffer session was that "if I said it was a joke that what would happen is they would refer it to some kind grievance committee for review but there would be no criminal prosecution, no possibility of going to jail or anything like that." (Tr. 896.) Reich then testified that he rejected that opportunity: "no matter what, no matter the consequences are, consequences were to me I said I would never, never say that. I didn't do it. As [I] sit here today, I will never say that I did something I didn't do." (Id.)

Third, Reich's trial testimony shows that he would never have pleaded guilty or accepted a non-prosecution agreement, had the Government offered one. Reich's testimony that he rejected the perceived opportunity to negotiate at the proffer session prevents Reich from now claiming that he would have accepted a plea at that time. And Reich's trial testimony also prevents him from claiming that he would have done so at any other time. In unequivocal terms, Reich testified that he would never admit to sending the forged order to avoid criminal prosecution. (Id.) Even if Reich proves that he instructed Mahler to pursue a compromise after the proffer session but before trial, he cannot establish a reasonable probability that he would have accepted such a compromise.

For these three reasons, a hearing is not necessary to determine whether Reich was denied effective assistance of counsel in the plea bargaining context. Because Reich has the burden of establishing both Strickland's deficient performance and the prejudice prongs, Birkin, 366 F.3d at 100, the court does not decide whether Mahler's representation was objectively unreasonable, see Strickland, 466 U.S. at 697. Reich's ineffective assistance of counsel claim on this basis is dismissed because Reich cannot show—by a reasonable probability—that the Government would have offered him, and that he would have accepted, a plea bargain or non-

prosecution agreement but for Mahler's allegedly deficient performance. See <u>Cullen</u>, 194 F.3d at 404.

### 3. Trial Preparation and Counsel's Knowledge of the Rules of Evidence

Reich argues that Mahler failed to adequately prepare for trial and did not adequately investigate his case. Reich makes the following allegations to support these claims: (i) Mahler did not interview witnesses until the eve of trial; (ii) Mahler did not attend Reich's probation interview; (iii) Mahler "never pursued any investigation"; (iv) Mahler agreed to a trial date when the defense's handwriting expert was out of the country; (v) Mahler "didn't get what [defense expert Mark Alcock] was talking about"; and (vi) Mahler did not know that an investigating agent's interview notes could only be used to refresh a witness's recollection and could not be admitted at trial as substantive evidence. (Petition 5-6.) Each allegation is without merit.

#### i. Interviewing Witnesses on the Eve of Trial

Reich provides no factual support for his claim that Mahler did not interview witnesses until the eve of trial. He does not indicate who Mahler failed to interview. Nor does Reich state whether or how any delayed interviews impacted his trial. It is a conclusory claim that does not suggest any prejudice to Reich's trial.

#### ii. Mahler's Failure to Attend the Probation Interview

Mahler's absence from Reich's probation interview does not establish ineffective assistance of counsel. Mahler had no duty to attend because Reich discharged him after the jury's verdict. (Petition 6.) In fact, Reich asserts that he discharged Mahler because Mahler said that attending the probation interview would be a waste of time. (<u>Id.</u>)

Even assuming that Mahler's conduct was deficient, Reich was not prejudiced because Mahler allegedly said that attending Reich's probation interview would be a waste of time.

Following his trial, Reich retained new counsel to represent him in "all post-verdict proceedings, including motions, sentence and any appeal." (See United States v. Reich, No. 04-CR-587 (NGG), Letter dated Oct. 3, 2005, (Docket Entry # 71) (E.D.N.Y.).) His post-verdict counsel submitted to this court a 43-page pre-sentencing memorandum and a letter responding to the Government's pre-sentencing memorandum. (See id., Pre-sentence memorandum (Docket Entry # 83); Letter dated March 20, 2006 (Docket Entry # 86).) Reich does not allege that his post-conviction attorney was deficient. And it appears that Reich's post-conviction counsel adequately represented him during the sentencing portion of his case. Accordingly, Reich was not deprived of effective assistance of counsel because Mahler did not attend the probation interview.

### iii. Mahler's Lack of Investigation

Reich generally alleges that Mahler "never pursued any investigation." He also claims that Mahler failed to investigate two specific factual issues. First, Reich states that Mahler learned for the first time at trial that the Davidson firm "had an employee who was with his firm for a short time and left shortly after the fictitious order appeared." (Petition 5.) Second, Reich asserts that Mahler failed to demand discovery from the Government's two expert witnesses.[3] (Id. at 5-6.)

Reich's general allegation that Mahler never pursued any investigation is not supported by the record. Mahler consistently communicated with the Government about discovery materials during Reich's criminal case. He requested a bill of particulars and discovery items from the Government on October 29, 2004. (See Reich, No. 04-CR-587, Mahler Affidavit & Ex.

---

[3] In the alternative, Reich claims that Mahler did request discovery from the Government's experts and that the Government failed to provide those reports in violation of Federal Rule of Criminal Procedure 16. (Id. 9.) Reich defaulted these claims by not raising them on direct appeal. He knew about them at trial. These claims are also meritless. The Government provided defense counsel with expert discovery before trial. (See Reich, 04-CR-487 (Docket Entries ## 36, 41, 45, 47).)

A (Docket Entry # 12).) In that request, Mahler asked for eight different items, including "copies of all reports of any experts expected to be called by the government to testify at trial . . . ." (Id.) Mahler made additional discovery demands by letters dated June 15, 2005, June 16, 2005, and July 29, 2005 (requesting Daubert hearing). (See id. (Docket Entries ## 37, 38, 51).)

Mahler's repeated requests for the Government's evidence show that he was actively investigating Reich's case. Reich's broad allegation that Mahler conducted no investigation is conclusory and unfounded in light of Mahler's frequent discovery demands. Mahler's repeated demands for the Government's expert disclosures also contradict Reich's specific allegation that Mahler failed to make appropriate expert discovery demands. Reich also states that co-counsel Sgarlato "immediately demanded a report from the government and requested a Daubert hearing," upon learning that the Government would be calling two expert witnesses. (Petition 5-6.) Finally, the statement that Mahler learned at trial about a short-term employee who worked at the Davidson firm is a conclusory generality that does not show deficient performance.

Accordingly, Reich's allegation that Mahler never pursued any investigation is unfounded and does not show that Mahler's representation fell below an objective standard of reasonableness.

  iv. Scheduling Trial

Reich alleges that Mahler provided ineffective assistance because he agreed to a trial date when the defense's handwriting expert, Andrew Sulner, was unavailable. This contention is without merit. Defense counsel represented on the trial record that they were prepared to call Ed Knack, an expert handwriting witness. (Tr. 796-97.) Reich has not alleged that Andrew Sulner commanded any additional expertise that Ed Knack did not. Because defense counsel was

prepared to call a handwriting expert, Reich cannot establish either <u>Strickland</u> prong on the basis that Mahler scheduled his trial when a particular handwriting expert was unavailable.

v. <u>Inability to Understand Witness Testimony</u>

Reich cannot show that Mahler's alleged inability to understand defense-expert Alcock's testimony prejudiced his case. Reich does not allege, and nothing in the record suggests, that the outcome of his trial would have been different had Mahler understood Alcock's testimony. Mahler did not cross-examine Alcock. Co-counsel Sgarlato did. (<u>See</u> Tr. 983-1040, 1180-1191.) Sgarlato also delivered Reich's summation that referenced Alcock's testimony. And Reich does not assert that Sgarlato was ineffective with respect to Alcock's testimony.

vi. <u>Mahler's Understanding of Evidence Law</u>

Reich's allegation that Mahler did not know the rules of evidence is without merit. According to Reich, the court explained to Mahler, at a pre-trial hearing, that an investigating agent's notes of witness interviews may not be used as substantive evidence, but only to refresh a witness's recollection. Reich claims that Mahler nonetheless disagreed with that rule and stated that he would rely on a "<u>Johnson v. Lutz</u>" approach with respect to that evidence.[4] Reich does not further explain the substance of Mahler's purported approach. Reich also does not indicate that Mahler ever applied the "<u>Johnson v. Lutz</u>" approach during the trial or in any other proceeding. In short, Mahler's comment during a private conversation with his client is not attorney conduct that can support a claim for ineffective assistance of counsel. There is no basis suggesting that Mahler's comment affected Reich's trial.

---

[4] <u>Johnson v. Lutz</u>, 170 N.E. 517 (N.Y. 1930) (holding that a police officer's report memorializing statements made by bystanders without personal knowledge of the facts was properly excluded from trial under a newly enacted state statute).

4.    Discovery Demands and Limiting Instructions

At Reich's trial, the defense called James Pelzer, a Clerk of the Second Department Appellate Division, as a character witness. Pelzer testified that both he and the community believed Reich to be an honest person. On cross-examination the Government asked Pelzer whether his opinion of Reich, or Reich's reputation in the community, would change if he knew that Reich had unilaterally changed the beneficiary of his law partner's life insurance policy from his partner's family to their law firm in violation of the firm's partnership agreement. Pelzer testified that it might. Reich then testified that he told his law partner that he was going to change the beneficiary before doing so and that he changed the policy's beneficiary to protect the firm. At trial, this court found that a letter Reich sent to his law partner, the partnership agreement, and the change in beneficiary form provided a good-faith basis for the Government's cross-examination.

On direct appeal of his conviction, Reich challenged the Government's cross-examination arguing that, because this information was not generally known in the community at-large, the question impermissibly called for evidence of specific acts. Reich, 479 F.3d at 191. He also argued that the question compelled him to testify in his own defense. The Second Circuit held that the Government's cross-examination was permissible because the question was directed, in part, at Mr. Pelzer's own opinion. The Court of Appeals also found that the question did not compel Reich to testify at his own trial. Id.

In this action, Reich asserts, on information and belief, that Mahler never made a discovery demand for the documents regarding the change in beneficiary under Federal Rule of Criminal Procedure 16. He further claims that even if Mahler had made the demand, Mahler was still unfamiliar with the contents of those documents. Reich argues that his defense was

"sandbagged" because Mahler was unfamiliar with the documents. He claims that had Mahler known of the documents and their contents, Mahler would have anticipated the Government's impeachment and requested an in limine hearing to determine whether the cross-examination should have been "precluded if inquiry was limited to 'reputation' as opposed to personal opinion, or completely barred." (Petition 8.) Finally, Reich asserts that Mahler's performance was deficient because he failed to request a limiting instruction restricting the Government's cross-examination to elicit only opinion testimony.

Reich's allegations are unfounded. During a colloquy addressing the admissibility of the Government's evidence, Mahler stated that he was "familiar" with the documents forming the basis of the Government's impeachment. (Tr. 834-35.) Mahler further stated that he had addressed the change in beneficiary issue with his client. According to Mahler, Reich explained the issue to him and Sgarlato, and that they did not think that Reich had done anything wrong. (Tr. 831.)

Mahler's representations—made on the record—show that the decision to call a character witness to testify was a strategic choice made in order to benefit his client. See Cox, 387 F.3d at 198. Mahler stated that he was familiar with the documents forming the basis of the Government's impeachment, (Tr. 834-35), and that he had discussed the issue with his client, (Tr. 831.) According to Mahler, Reich clearly explained what transpired with his former law partner: "We talked to [Reich] and his explanation is perfectly clear to us. We don't think he did anything wrong." (Id.) Based on that understanding, Reich's attorneys decided that the testimony of the Clerk of the Second Department Appellate Division would benefit their client. This is precisely the kind of strategic choice, made after investigation of facts and relevant law, that is "virtually unchallengable." See Strickland, 466 U.S. at 690-91. A finding that Mahler's

performance was deficient because the Government's questioning might have affected Mahler's trial strategy would be based on the distorting effects of hindsight, rather than the facts as they were at the time of the challenged conduct. See id. at 689-90.

Reich's claim that Mahler was ineffective for failing to request an instruction limiting the Government's cross-examination to opinion testimony is also without merit. The Court of Appeals found that the question was proper because it was partly directed at opinion testimony. Reich, 479 F.3d at 192. To the extent that the question improperly elicited reputation testimony, this court previously found that it "did not substantially influence the jury in light of the strong evidence presented by the Government showing Reich's culpability for the charges of which he was convicted." Reich, 420 F. Supp. 2d at 91. There cannot be a reasonable probability that the outcome of Reich's trial would not have been different had Mahler requested a limiting instruction. See Strickland, 466 U.S. at 694. It is not enough that admission of the reputation evidence "had some conceivable effect on the outcome of the proceeding." Id. at 693.

5.    Failure to Properly Subpoena Exculpatory Testimony

The FBI's document examiner, Laurie Gottesman, prepared a report stating that "she could not determine whether any of the specimens of faxes allegedly transmitted from [Reich's] home were sent from the same transmitting device." (See Gov't Mem. Ex. A ("Gottesman Report"), at 2.) Her report states, inter alia, that the "P 01" entries on the analyzed fax specimens are similar in size and design, but "because of the lack of identifying characteristics as well as probable differences in the receiving facsimile devices, it is not possible to determine whether any of the[] specimens were sent from the same transmitting facsimile device." (Id.)

Gottesman did not testify at trial. The Government did not call her and Reich claims that Mahler was unable to properly subpoena her for trial. At trial, the court also denied Mahler's

request for a missing-witness instruction, finding that the Government had no reason to call her on its case-in-chief. Reich now claims that Mahler's inability to obtain Gottesman's testimony at trial, and Mahler's failure to bring the matter to the court's attention earlier than he did, prejudiced his trial because the Government argued in its rebuttal summation that the specimen faxes did match, contrary to Gottesman's finding.[5]

Assuming that Mahler acted unreasonably in failing to subpoena Gottesman's testimony at trial, Reich cannot show, by a reasonable probability, that the outcome of his trial would have been different had Gottesman testified. Her testimony would only have been relevant to the subsidiary fact of exactly how Reich may have sent the forged order. It would not have undermined the Government's proof, and the weight of the evidence, that Reich had created and sent the forged order. In ruling that a new trial was not warranted under Federal Rule of Criminal Procedure 33 based on defense expert Alcock's "uncontradicted" testimony that "Reich's fax modem did not send the forged order," this court observed that "the weight of the evidence supports the inference that Reich was otherwise capable of creating and faxing the forged [o]rder from his home." Reich, 420 F. Supp. 2d at 85-87. Alcock's testimony did not create "a reasonable doubt as to Reich's ability to send the forged [o]rder." Id. at 87. "The Government presented competent and admissible evidence demonstrating that Reich had the capacity to fax the forged [o]rder from his home." Id. On direct appeal, Reich conceded that there was evidence that the forged order was faxed from his home. Reich, 479 F.3d at 190-91.

Because the issue of how Reich created and sent the forged order was a subsidiary fact not necessary for the jury to find that Reich created and sent the forged order, the evidence

---

[5] In its rebuttal summation the Government argued that evidence adduced at trial showed that the specimen faxes were all sent from the same transmitting machine. (See Tr. 1392.) AUSA Katz argued that the "No. 1" or "P 02" notation from the faxes to third parties match the notations on the forged-order fax because they are in the same location and appear to be the same font. (Id.)

supporting the conclusion that Reich sent the forged order, and the negligible support that Gottesman's report supports a contrary conclusion, this court finds that Reich could not have been prejudiced by Mahler's inability to question Gottesman at trial.

### B.   Prosecution's Alleged Failure to Disclose Evidence to Defendant

Reich alleges that after his trial, he spoke with four individuals who had "been visited" by Agent Wilfing. (Petition 10.)  Reich alleges that each of them provided exculpatory information to Agent Wilfing and that Agent Wilfing "told them not to discuss anything with [Reich], as it might be construed as obstruction of justice." (Id.)  According to Reich, one individual told Agent Wilfing that he had been in his house on numerous occasions, in every room, and "never saw a fax machine"; another stated that Reich "used a flatbed scanner, not a fax"; and a third stated that "the comparison document he demanded was probably a photocopy, not a fax." (Id.)  Reich claims that the Government failed to disclose this evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).  He requests that the court direct Agent Wilfing to submit his "302s" to the court for inspection. (Petition 10.)

At the threshold, it appears that Reich may have procedurally defaulted his Brady claims. He alleges that he learned about Agent Wilfing's conversations after trial. (Petition 9.)  "In general, a claim may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review." Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007). "If such a claim has not been presented on direct review, the procedural default bar may be overcome only where the petitioner establishes either (1) cause for the failure to bring a direct appeal and actual prejudice from the alleged violations; or (2) actual innocence." Id. (internal quotation marks omitted); see also Chacko v. United States, No. 00-CV-405 (JGK), 2000 WL 1808662, at *3 (S.D.N.Y. Dec. 11, 2000) (finding that petitioner procedurally defaulted Brady

claims because appellate counsel knew about them and could have raised them on appeal). The court need not decide whether Reich defaulted his <u>Brady</u> claims because they are without merit.

"There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." <u>Boyette v. Lefevre</u>, 246 F.3d 76, 89 (2d Cir. 2001) (quoting <u>Stickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)). "Evidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." <u>United States v. LeRoy</u>, 687 F.2d 610, 618 (2d Cir. 1982) (holding that the Government is not required to disclose grand jury testimony to a defendant who is "on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." <u>United States v. Stewart</u>, 513 F.2d 957, 960 (2d Cir. 1975)).

Reich cannot establish a <u>Brady</u> violation because the Government did not "suppress" the information collected by Agent Wilfing. Reich knew, or should have known, of the essential facts which he alleges that two of the four informants disclosed to Agent Wilfing: that he did not have a fax machine in his house and that he used a flat-bed scanner instead of a fax machine. Through his own personal experience, Reich certainly knew whether he had a fax machine in his house.[6] And there can be no doubt that Reich knew whether he personally used a flatbed scanner or a fax machine. Reich does not allege that he ever asked the informants to disclose to him any exculpatory evidence they may have possessed. If he wanted to take advantage of any such exculpatory testimony at trial, he could have asked the informants to voluntarily testify, and if

---

[6] In fact, Reich testified at trial that he owned a fax machine. (Tr. 891-92.) He testified that he purchased a Canon Fax Phone 8 in the early 1980 and "threw it out years ago." (<u>Id.</u>)

unsuccessful, he could have subpoenaed their testimony regardless of Agent Wilfing's admonition.

Reich's allegation that one individual told Agent Wilfing that "the comparison document [Agent Wilfing] demanded was probably a photo copy, not a fax" also cannot support a Brady claim. Whether this individual had a document that may have been a photocopy or a fax is immaterial to Reich's convictions. United States v. Bagley, 473 U.S. 667, 684 (1985) ("[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."). The weight of the evidence at trial showed that Reich was capable of creating and faxing the forged order from his home. That a third party possessed a faxed or photocopied document does not create a reasonable probability that Reich's trial would have had a different result had the Government disclosed this information. See Id. Finally, Reich's unsupported allegation that a fourth individual provided Agent Wilfing with exculpatory information is a conclusory generality that cannot support his Brady claim.

## C.   Sentencing Recommendation

Reich's final claim is that the court unconstitutionally "receive[d] a private recommendation from the Probation Department." (Petition 10.) Reich argues that this procedure denied him due process because he had no opportunity to comment on the recommendation or attack its underlying reasoning or factual predicates. (Id.) Reich asserts that he discovered the recommendation following his sentencing and surrender. (Id.) The court does not decide whether Reich defaulted this claim because the claim is without merit.[7]

---

[7] Reich supports his claim by citing United States v. Anati, 457 F.3d 233 (2d Cir. 2006), rev'd, Irizarry v. United States, —U.S. —, 128 S. Ct. 2198 (2008). Together these cases stand for the proposition that Federal Rule of Criminal Procedure 32(h) requires a district court to give the parties notice if it is considering an upward departure from the sentencing guidelines, but not if it is considering an upward variance based on § 3553(a) factors. Reich's

24

Federal Rule of Criminal Procedure 32 requires "that all facts relevant to the defendant's sentence be provided to the defendant for adversarial testing." <u>United States v. Baldrich</u>, 471 F.3d 1110, 1114 (9th Cir. 2006). This rule "clearly extends to the factual information underlying a probation officer's confidential sentencing recommendation, even though the recommendation itself need not be disclosed."[8] <u>Id.</u> Due process does not require a sentencing court to disclose a probation officer's confidential sentencing recommendation when the defendant has received all the factual information underlying that recommendation. <u>See id.</u> at 1113-16; <u>accord</u> <u>United States v. Cole</u>, 296 Fed. Appx. 195, 2008 WL 4643361, at *2 (2d Cir. Oct. 21, 2008). To the contrary, "compliance with . . . Rule 32 disclosure requirements satisfies due process." <u>Baldrich</u>, 471 F.3d at 1114.

In this case, the probation department's sentencing recommendation contains no factual material that has not been previously disclosed to the parties. Upon a secondary review of the recommendation for this Memorandum & Order, the court finds that all the information underlying the probation department's recommendation is contained in Reich's pre-sentence report. Moreover, at Reich's sentencing hearing, the court named each of the documents that it relied on in determining his sentence. (<u>See</u> <u>Reich</u>, 04-CR-587, Sentencing Tr. (Docket Entry # 106) 2-4.) The court did not state that it relied on a probation department recommendation. (<u>Id.</u>) For all these reasons, Reich's claim that the court unconstitutionally withheld a sentencing recommendation issued by the probation department is without merit.

---

guidelines range was 27-33 months imprisonment. (Sentencing Transcript dated May 5, 2006 ("Sentencing Tr.), <u>Reich</u>, No. 04-CR-587 (Docket Entry # 106) at 39.) The court sentenced Reich within guidelines to 27 months imprisonment. (<u>Id.</u>) Because Reich was sentenced within his guidelines range without departure or variance, neither <u>Anati</u> nor <u>Irizarry</u> are applicable.

[8] Federal Rule of Criminal Procedure 32(e)(3) states that "[b]y local rule or by order in a case, the court may direct the probation officer not to disclose to anyone other than the court the officer's recommendation on the sentence."

25

## III. CONCLUSION

For the foregoing reasons, Reich's Petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 is DENIED. Because Reich has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
          December 31, 2009

NICHOLAS G. GARAUFIS
United States District Judge